IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs at Knoxville DECEMBER 13, 2011

**TARINA SIMMONS v. STATE OF TENNESSEE**

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2008C3114     J. Randall Wyatt, Jr., Judge**

**No. M2011-00953-CCA-R3-PC - Filed March 27, 2012**

The petitioner, Tarina Simmons, appeals the Davidson County Criminal Court's denial of her petition for post-conviction relief. The petitioner, pursuant to a negotiated plea agreement, entered best-interest guilty pleas to two counts of second degree murder and was sentenced to concurrent sentences of thirty-five years. Thereafter, she filed a post-conviction petition alleging that her guilty pleas were not knowingly and voluntarily entered based upon the ineffective assistance of counsel. Specifically, she contends that trial counsel was ineffective by: (1) failing to adequately consult with her about the plea process and review the evidence against her; (2) overemphasizing the possible number of years the petitioner could receive in jail, resulting in the pleas being coerced; and (3) allowing the petitioner to proceed when her mental state was not stable enough to allow her to properly participate in the process. Following review of the record, we find no error and affirm the denial of post-conviction relief.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which JOSEPH M. TIPTON, P.J., and JAMES CURWOOD WITT, JR., J., joined.

Joshua L. Brand, Nashville, Tennessee, for the appellant, Tarina Simmons.

Robert E. Cooper, Jr., Attorney General and Reporter; Cameron L. Hyder, Assistant Attorney General; Victor S. (Torry) Johnson, III, District Attorney General; and Ben Ford and Janice Norman Ware, Assistant District Attorney Generals, for the appellee, State of Tennessee.

**OPINION**

## Procedural History

The facts underlying the petitioner's convictions for second degree murder, as recited at the guilty plea hearing, are as follows:

Your Honor, had this case gone to trial the State's proof would have shown that on the date prior to October 26, 2007 Jason Bobo was at the [petitioner's] home which was located at 620 Maclaurin Court. On that date Jason Bobo, the [petitioner], and others discussed committing a robbery on the Bellacino's Restaurant which was located at 21 White Bridge Road in Davidson County. Jason Bobo had previously been employed at Bellacino's.

On October 26, 2007, Jason Bobo and Crystle Rutherford were at the [petitioner's] home when Vanity Weary picked Jason Bobo and Crystle Rutherford up and drove them to an apartment complex located near the Bellacino's Restaurant. Ms. Weary parked in a parking place at the apartment complex. Ravaughn Harris was present in the parking lot of the apartment complex. Ms. Weary left the apartment complex. After a brief exchange Jason Bobo and Crystle Rutherford left the apartment complex parking lot and began walking the short distance to the Bellacino's Restaurant.

Inside Bellacino's Restaurant were Christopher Caris, Joshua Cole, Jan Waddell and Clint Walker who were all employees of the restaurant. There was also a patron inside the restaurant. When Jason Bobo and Crystle Rutherford entered the restaurant it was 9:56 p.m., both Jason Bobo and Crystle Rutherford were wearing hats on their heads and jackets.

Crystle Rutherford remained up front while Jason Bobo walked past the bathroom into the kitchen area. Jason Bobo grabbed Mr. Christopher Caris and at gun point forced Christopher Caris to open the office door.

[Jason Bobo] ordered the other restaurant patron, Clint Walker, Jan Waddell, and Joshua Cole to walk to the back of the store. Crystle Rutherford then ordered the same group to lie down on the floor. Jason Bobo entered the office with Christopher Caris and forced Christopher Caris to lay face down on the office floor.

Jason Bobo then removed cash from the open safe, after an accidental

-2-

discharge fired by Jason Bobo, Clint Walker managed to get off the ground and ran out of the rear exit. Clint Walker reached a nearby restaurant and called the police.

Meanwhile Crystle Rutherford ordered the restaurant patron and Jan Waddell to move up to the Coke machine. Jason Bobo then shot Christopher Caris in the head at close range. Jason Bobo ran into the kitchen and shot Joshua Cole in the head at close range. Christopher Caris and Joshua Cole died as a result of their injuries.

Jason Bobo and Crystle Rutherford then ran out the back door of the restaurant. Once Jason Bobo and Crystle Rutherford left the restaurant they returned to the apartment complex parking lot where Ravaughn Harris was waiting for them.

Ravaughn Harris drove them to a bar where the three entered for a period of time. Harris, Rutherford, and Bobo then got back into Harris' car and drove to the [petitioner's] home. Harris, Rutherford, and Bobo all got out of Harris' car and entered the [petitioner's] home.

Bobo, Harris, Rutherford, and the [petitioner] went into the [petitioner's] bedroom where they dumped out the contents of Bobo's backpack which contained the money that he and Rutherford had taken during the robbery and murders. The money was divvied up. Bobo, Harris, Rutherford, and the [petitioner] received a share of the stolen money.

Harris and Rutherford left the [petitioner's] home. Bobo hid out at the [petitioner's] home for a period of time after the robberies and murders. When the police came to the [petitioner's] home to question her about the possible whereabouts of Bobo she lied to the police telling then that she did not where he was. In fact, Bobo was hiding in her home while the police were actually there.

Eventually, the backpack, clothes, and murder weapon were found in the [petitioner's] backyard.

Based upon these actions, the petitioner was indicted by a Davidson County grand jury for two counts of first-degree premeditated murder, two counts of first-degree felony murder, and especially aggravated robbery. Multiple co-defendants were also charged in separate cases. Thereafter, the petitioner entered best-interest guilty pleas to two counts of the lesser

offense of second degree murder. Pursuant to the agreement, she was sentenced to serve concurrent sentences of thirty-five years, as a violent offender, in the Department of Correction. No direct appeal was taken.

Subsequently, the petitioner filed a *pro se* petition for post-conviction relief alleging that her pleas were not knowingly and voluntarily entered based upon the ineffective assistance of counsel. Following the appointment of counsel, an amended petition was filed. Thereafter, an evidentiary hearing was held before the post-conviction court, at which the petitioner and trial counsel testified. The petitioner testified that trial counsel had only visited her in jail on two occasions, but she acknowledged that he met with her at each court appearance and that she also received visits from trial counsel's assistant and a private investigator. According to the petitioner, she felt that trial counsel had failed to adequately inform her of the evidence which the State had against her. Initially, she testified that she was not able to review the discovery materials until six months after her conviction, but later contradicted this testimony by stating that trial counsel's assistant had reviewed the discovery materials with her. She acknowledged that she was aware of a statement made by someone which was to be used against her; however, she maintained that she had no knowledge of who made the statement or what information it contained.

The petitioner testified that she was insistent with trial counsel and his associates that she was innocent and wanted to proceed to trial. She acknowledged that trial counsel told her that she was facing a possible sentence of one hundred seventeen years if convicted, although she claimed she did not really understand how counsel arrived at that number. She stated that no discussion of a plea agreement took place until after trial counsel learned that the petitioner was suspected in another murder case, known as the "Good Samaritan" murders. She admitted that she had benefitted from the proceeds in that murder and was told that the State had information which implicated her. The petitioner testified that trial counsel was adamant that she should accept the offer and that she did so only based upon this advice. According to the petitioner, she felt that trial counsel "was in a position to tell" her what do and she merely listened to him. On cross-examination, she acknowledged that trial counsel had specifically informed her that if she was convicted in the first case, the State would be able to use those convictions as an aggravating factor to seek the death penalty in the second case. She testified that she had that fact in mind when she decided to accept the pleas because it scared her. The petitioner testified that she now felt that trial counsel did not know what was best and that she "should have went all the way and proved that I was innocent."

The petitioner also gave testimony with regard to her mental state. She stated that she had been diagnosed with a mental disease and was "sporadically" taking her medications at the time of her arrest. However, once incarcerated on these charges, she began to regularly take her prescriptions. She stated that the medications affected her ability to understand and

-4-

make clear decisions and made her feel vulnerable. The petitioner testified that she was no longer taking her medications. She did acknowledge that trial counsel had her evaluated by doctors, who determined that she was fine as long as she continued to take her medications.

Finally, the petitioner acknowledged that prior to accepting the pleas, the trial court was extremely cautious in determining whether it was the petitioner's decision to plead guilty. She recalled that the court specifically questioned her regarding her medications and that she had answered that she was fine to make decisions. However, at the post-conviction hearing, she testified that she did not believe she was "in her right mind" and was scared at the time of the plea hearing.

The only other witness to testify was trial counsel, who stated that he had been appointed to represent the petitioner at the arraignment phase of her case. He related that he, along with an investigator and an assistant, had all visited with the petitioner and discussed the case with her. Trial counsel testified that he thoroughly covered all pertinent parts of discovery with the petitioner, although he did acknowledge that he glossed over the parts relevant only to the co-defendants in the case. He testified that he explained to the petitioner that there was a witness willing to testify against her. He also stated that the petitioner had admitted to both himself and his assistant that she had benefitted in the proceeds of the crime and that, therefore, he was unable to let her testify otherwise on the stand.

Trial counsel stated that when the "Good Samaritan" case arose, he became extremely concerned for the petitioner. He related that he sat down and explained both the best and worst possible scenarios involving both cases. He acknowledged informing the petitioner that, based upon the evidence, he was concerned that a jury could convict her. In his opinion, it was the possibility of the death penalty in the second case which caused the petitioner to accept the plea agreement. The agreement involved the petitioner pleading to the lesser offenses of second degree murder in the first case, receiving thirty-five-year concurrent sentences, and a guarantee not to prosecute her in the "Good Samaritan" case.

Trial counsel stated that on the day of the plea hearing, the petitioner appeared to be rational. He acknowledged that she was very emotional, but he did not feel that she was mentally incapable of making the decision. Trial counsel indicated that, at times prior to the hearing, he was concerned about the petitioner's mental state, which led to his requesting an evaluation. The results of that evaluation were that the petitioner was fine as long as she was on her medication. Because the petitioner was on her medications at the guilty plea hearing and appeared stable, trial counsel felt comfortable proceeding.

On cross-examination, trial counsel testified that he did not initially discuss a plea

with the State before receiving their offer because the petitioner wanted to go to trial. He testified that he gave her the best and worst case scenarios, including a possible death sentence, if she proceeded to trail. After the "Good Samaritan" case arose, he made sure that the petitioner understood that she faced a possible death sentence. He testified that he advised her that, in his opinion, the State's plea offer served her best interest. At that point, the petitioner said that she wanted to accept the offer. Trial counsel further testified that he confirmed the petitioner's decision to accept the pleas with her several times before the plea hearing.

After hearing the evidence presented, the post-conviction court took the matter under advisement. Subsequently, the court entered a written order denying relief. The petitioner has now timely appealed.

**Analysis**

On appeal, the petitioner contends that the post-conviction court erroneously denied her petition because her guilty pleas were not entered into knowingly, voluntarily, and understandingly because she was denied her right to the effective assistance of counsel. Specifically, she contends that: (1) trial counsel failed to adequately consult with her about the plea process and review the evidence against her; (2) trial counsel overemphasized the possible number of years the petitioner could receive in jail, resulting in the plea being coerced; and (3) trial counsel was in error allowing the petitioner to participate in the plea process when her mental state prevented her from understanding.

In evaluating the knowing and voluntary nature of a best-interest guilty plea, the United States Supreme Court has held that, "[t]he standard was and remains whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant." *North Carolina v. Alford*, 400 U.S. 25, 31 (1970) (citations omitted). In making this determination, the reviewing court must look to the totality of the circumstances. *State v. Turner*, 919 S.W.2d 346, 353 (Tenn. Crim. App. 1995); *see also Chamberlain v. State*, 815 S.W.2d 534, 542 (Tenn. Crim. App. 1990). Indeed, a

> court charged with determining whether . . . pleas were "voluntary" and "intelligent" must look to various circumstantial factors, such as the relative intelligence of the defendant; the degree of his familiarity with criminal proceedings; whether he was represented by competent counsel and had the opportunity to confer with counsel about the options available to him; the extent of advice from counsel and the court concerning the charges against him; and the reasons for his decision to plead guilty, including a desire to avoid a greater penalty that might result from a jury trial.

*Blankenship v. State*, 858 S.W.2d 897, 904 (Tenn. 1993) (citations omitted).

Once a guilty plea has been entered, effectiveness of counsel is relevant only to the extent that it affects the voluntariness of the plea. In this respect, such claims of ineffective assistance necessarily implicate that guilty pleas be voluntarily and intelligently made. *Hill v. Lockhart*, 474 U.S. 52, 56 (1985) (citing *Alford*, 400 U.S. at 31).

To succeed in a challenge for ineffective assistance of counsel, a petitioner must demonstrate that counsel's representation fell below the range of competence demanded of attorneys in criminal cases. *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). Under *Strickland v. Washington*, 466 U.S. 668, 687 (1984), the petitioner must establish (1) deficient representation and (2) prejudice resulting from the deficiency. In the context of a guilty plea, to satisfy the second prong of *Strickland*, the petitioner must show that "there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Lockhart*, 474 U.S. at 59; *see also Walton v. State*, 966 S.W.2d 54, 55 (Tenn. Crim. App. 1997). The petitioner is not entitled to the benefit of hindsight, may not second-guess a reasonably based trial strategy, and cannot criticize a sound, but unsuccessful, tactical decision made during the course of the proceeding. *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). This deference to the tactical decisions of trial counsel, however, is dependant upon a showing that the decisions were made after adequate preparation. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

The issues of deficient performance by counsel and possible prejudice to the defense are mixed questions of law and fact. *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). "[A] trial court's *findings of fact* underlying a claim of ineffective assistance of counsel are reviewed on appeal under a *de novo* standard, accompanied with a presumption that those findings are correct unless the preponderance of the evidence is otherwise." *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001) (citing Tenn. R. App. P. 13(d)). However, *conclusions of law* are reviewed under a purely *de novo* standard, with no presumption of correctness. *Id*. at 458.

As noted, the petitioner finds fault with trial counsel's representation of her. Specifically, she contends that he failed to adequately advise her of the evidence against her, ensure that she understood the evidence, discuss that evidence with her, and use it to develop defenses for trial. She also contends that trial counsel failed to adequately consult with her and that she only entered the pleas "under the coercive pressure placed by trial counsel's emphasis on the number of years she might be facing if convicted." Based upon these arguments, the petitioner contends that the record establishes that her pleas were not knowingly and voluntarily entered. She also contests whether she was in fact able to enter

her pleas knowingly and voluntarily based upon her mental state. While she acknowledges the determinations made by the examining physicians, she claims they were in error, contending that she was "the best judge of how [she was] feeling." She asserts that, "[s]imple reactions of fear were her motivation to plea, the medications kept her objections complacent, and [she] was thus incapable of acting in a knowing and voluntary manner." She contends that had trial counsel been effective, he would have known this and not relied solely upon the medical findings.

In denying relief, the post-conviction court, in its written order, found as follows:

The Petitioner first alleges that [trial counsel] failed to consult with [her] and explain the evidence against her and her options. The Court finds that [trial counsel], either himself or through one of his agents, . . . visited the Petitioner in jail approximately six (6) times over the course of his representation of her. The Court finds that [trial counsel] also met with the Petitioner on multiple court dates, in addition to their meetings at jail. The Court accredits the testimony that he went over the discovery with the Petitioner, and he informed her of the possible options in her case. The Court therefore finds that the Petitioner has failed to demonstrate these particular deficiencies through clear and convincing evidence. The Court finds that this issue is without merit.

The Petitioner also alleges that [trial counsel] failed to provide [her] with discovery. The Court notes that the Petitioner testified that she was only provided discovery after she accepted the plea offer. The Court accredits [trial counsel's] testimony that he went over the discovery with her in this case before the plea. The Court finds that the Petitioner did not state how having a physical copy of the discovery would have changed her mind in accepting the guilty plea in this case. The Court finds that reviewing the discovery with [trial counsel] and his associates numerous times would be sufficient to make an intelligent choice as to whether or not to accept the plea. The Court finds that the Petitioner has failed to establish, by clear and convincing evidence, that [trial counsel] failed to provide her with discovery or that this alleged deficiency had a prejudicial effect.

The Petitioner next alleges that [trial counsel] did not review the petition to enter the guilty plea with her. The Court finds that the petition was signed on March 8, 2010, and the Court accepted the guilty plea on March 12, 2010. The Court accredits [trial counsel's] testimony that he repeatedly asked the Petitioner if she was comfortable in accepting the plea offer and the

-8-

consequences of it. The Court also accredits [trial counsel's] testimony that he and his colleagues went to visit the Petitioner in jail for a lengthy discussion about her guilty plea. In addition to the Court reviewing the Petitioner's rights in the plea colloquy, the Court finds that the Petitioner represented to the Court during the plea that she went over the plea petition with [trial counsel.] . . . The Court finds that the Petitioner has failed to establish, by clear and convincing evidence, that [trial counsel] failed to review the plea petition with her or that this alleged deficiency caused any prejudice to her. The Court finds that this issue is without merit.

The Petitioner also alleged that the majority of [trial counsel's] advice revolved around the extreme exposure to jail time she faced in this case. The Court finds that the Petitioner was charged with two (2) counts of First Degree Murder, two (2) counts of Felony Murder, and one (1) count of Especially Aggravated Robbery. The Court finds that it was established at the hearing that the State was considering pursuing the death penalty upon the investigation into the Petitioner's involvement in the second murder case. The Court finds that [trial counsel] was able to obtain a plea offer that permitted the Petitioner to avoid facing the death penalty. The Court finds that [trial counsel] would have been derelict in his duty as counsel to not explain the maximum penal exposure that she was potentially facing. The Court finds that the Petitioner has failed to establish, by clear and convincing evidence, that [trial counsel's] discussion about the maximum penalty in her case caused the Petitioner any prejudice. The Court finds that this issue is without merit.

. . . .

After considering the testimony, the exhibits tendered at the hearing, and the transcript of the plea proceedings, the Court does not find any merit to the Petitioner's contention that the guilty plea was not entered into voluntarily, knowingly, and intelligently. The Court finds that the Petitioner was represented by an experienced competent attorney who adequately explained the criminal proceedings that the Petitioner was facing and the possible alternatives. The Court finds a lack of any evidence indicating coercion, threats, or any other sign that the Petitioner's will was overborne by an outside influence.

The Court acknowledges the Petitioner's allegations that the medications she was prescribed at the time of the plea colloquy affected her mental clarity and ability to comprehend her decision. However, the Court

finds that, upon his own initiative, [trial counsel] had the petitioner evaluated by the Vanderbilt University Forensic Evaluation Team approximately two (2) months before trial to determine her mental health. The Court finds that Dr. Kimberly Brown, with assistance from the Forensic Evaluation Team, concluded that the Petitioner's "mental condition at the time of the evaluation was such that she had sufficient present ability to consult with her lawyer with a reasonable degree of rational understanding and a rational as well as factual understanding of the proceedings against her." . . . Furthermore, the Court was aware at the time of the plea proceedings of the Petitioner's mental health and her doctor's prescription for certain stabilizing medications, and the Court addressed her mental health during the plea colloquy. [In response, the Petitioner indicated that she understood what she was doing.] The Court accredits [trial counsel's] testimony that he went over her decision to plead guilty multiple times and that he felt that she understood what she was doing and the consequences of her decision. The Court notes that the Petitioner did not provide any expert testimony at the hearing on this matter. After considering the testimony at the hearing, the transcript of the guilty plea, and the Letter of Competency from the Vanderbilt University Forensic Evaluation Team, the Court finds that the Petitioner did not establish, by clear and convincing evidence, that her plea was entered into involuntarily or without her understanding of the consequences of accepting the plea. The Court finds that the Petitioner was fully apprised of the charges against her and the possible penalties of the indicted offenses, and she voluntarily decided to accept the State's offer to plead guilty to two (2) counts of Second Degree Murder and receive thirty-five (35) years imprisonment instead of going to trial on the First Degree Murder charges. The Court is therefore of the opinion that the Petitioner's plea of guilty was entered knowingly, voluntarily, and intelligently.

Following our review of the record, we conclude that nothing preponderates against the extensive findings made by the post-conviction court. Trial counsel testified that both he and his associates met with the petitioner on multiple occasions and reviewed the discovery materials with her and explained the evidence that the State had against her. Trial counsel also stated that he had thoroughly reviewed the possible sentences the petitioner could receive if she was convicted. He stated on the record that he explained the terms of the plea agreement to the petitioner and that she appeared to understand and was comfortable with the decision to accept the pleas. These statements by trial counsel were accredited by the post-conviction court. As has been repeatedly held, this court is bound by credibility findings of the lower court unless the evidence preponderates otherwise. *Burns*, 6 S.W.3d at 461. It is simply not the province of this court to reevaluate credibility findings or the

weight assigned to evidence by the lower court. Moreover, the transcript of the plea hearing in this case lends great credibility to trial counsel's statements. Prior to accepting the pleas from the petitioner, the trial court extensively questioned her regarding her understanding of the plea agreement. The petitioner testified that she had read the full agreement, that she fully understood the agreement, and was voluntarily entering the pleas.

The petitioner's argument that she was coerced into accepting the plea agreement by trial counsel's extensive coverage of the possible sentences she could receive is simply not supported by the record. As the post-conviction court noted, trial counsel would have in fact been deficient if he failed to adequately apprise the petitioner of the possible consequences she was facing. She was charged with multiple counts of first degree murder and especially aggravated robbery and was facing a possible term of over one hundred years. When the second case arose, there was a chance that she was facing a death sentence. Trial counsel was able to negotiate an effective sentence of thirty-five years. By the petitioner's own testimony, she was scared of the possible exposure she faced and that led to her decision to accept the pleas. Entering a plea to avoid great exposure is a valid reason to accept an offer and in no way supports the argument that trial counsel was ineffective or that the petitioner did not understand the options available to her.

Indeed, based upon the petitioner's argument, it appears that her main contention is not that she did not enter the pleas with an understanding of it because of trial counsel's failure to explain it; rather, she appears to contend that she was simply unable to understand based upon her mental condition. She faults trial counsel for failing to be more aware of her mental condition and for not preventing her from entering the agreement. This, again, is simply not supported by the record. Trial counsel, based upon concerns he had when meeting with the petitioner, had her evaluated by a team of medical professionals. The conclusion reached was that the petitioner was competent to participate in her defense as long as she continued to take her medication. By the petitioner's own testimony, she was in fact regularly taking her medication during the plea negotiation period. Trial counsel testified that he felt that the petitioner understood what she was doing and was comfortable proceeding with the pleas based upon the medical reports. Like the post-conviction court, we cannot conclude that trial counsel was in any way ineffective for failing to do more.

The only testimony given to the contrary was the petitioner's own testimony that she was better absent the medication. However, she presented no expert testimony which would bolster her opinion that she was not competent to understand the decision to plead guilty. Further, we cannot ignore the petitioner's testimony at the plea acceptance hearing, in response to questioning by the court, regarding her medication usage. The court, who was aware of the possible mental issues, took great care in questioning the petitioner prior to accepting the pleas. The petitioner maintained that she understood what she was doing and

-11-

was voluntarily entering the pleas. Absent proof to the contrary, the petitioner's own testimony stands against her argument. The petitioner has simply failed to carry her burden of entitlement to relief.

## CONCLUSION

Based upon the foregoing, the denial of post-conviction relief is affirmed.


_____
JOHN EVERETT WILLIAMS, JUDGE